IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MCAON DIVISION

| | | |
|---|---|---|
| SHEMIKA CORBIN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 5:15-CV-153 (CAR) |
| | : | |
| MEDICAL CENTER, NAVICENT | : | |
| HEALTH f/k/a THE MEDICAL | : | |
| CENTER OF CENTRAL GEORGIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Shemika Corbin brings this action alleging Defendant Medical Center, Navicent Health, f/k/a the Medical Center of Central Georgia ("MCNH"), terminated her employment in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102 *et seq.* ("ADA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"). Plaintiff has filed a Motion for Substitution of Party or in the Alternative Leave to Amend Complaint to substitute MCNH for Navicent Health, Inc., the entity Plaintiff originally named as the defendant in this case. Defendant has moved for summary judgment. Having considered the parties' arguments, the record, and applicable law, the Court **GRANTS** Plaintiff's Motion to Amend Complaint [Doc. 19] and **GRANTS in part and DENIES in part** Defendant's Motion for Summary Judgment [Doc. 13]. As explained below, Defendant is entitled to summary judgment on Plaintiff's

ADA claims, but Plaintiff's FMLA interference and retaliation claims present genuine issues of material fact that preclude summary judgment. The parties are **DIRECTED** to appear before this Court on October 18, 2016 at 2:00 p.m. for a hearing to determine whether Plaintiff's failure to disclose this case in her Bankruptcy Petition judicially estops her from asserting her claims for money damages.

## MOTION TO AMEND COMPLAINT

Plaintiff originally filed her Complaint against Navicent Health, Inc. f/k/a The Medical Center of Central Georgia ("Navicent"). However, the Medical Center of Central Georgia, Inc. is a separate and independent subsidiary of Navicent and is now known as Medical Center, Navicent Health ("MCNH"). MCNH employed Plaintiff; Navicent has never employed her. Plaintiff now moves to amend her Complaint to add MCNH as the proper party Defendant.[1]

Because Plaintiff filed her Motion to Amend Complaint after the Scheduling Order deadline, "Rule 16 [of the Federal Rules of Civil Procedure] is the proper guide for determining whether a party's delay may be excused."[2] Under Rule 16, deadlines in the scheduling order "may be modified only for good cause and with the judge's consent."[3] If the plaintiff demonstrates good cause, Rule 15 instructs the Court to "freely give leave

---

[1] Plaintiff also moves, in the alternative, to substitute the proper party Defendant under Rule 25. However, substitution is not proper in this case. *See* Fed. R. Civ. P. 25.

[2] *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998) (*per curiam*).

[3] Fed. R. Civ. P. 16(b)(4).

[to amend] when justice so requires."[4]

Because no additional discovery is necessary, Defendant will not be prejudiced by the amendment, and the amendment will not delay the resolution of this case, good cause exists to permit the belated filing of Plaintiff's Motion to Amend Complaint. Thus, Plaintiff's Motion to Amend is **GRANTED**, and MCNH is hereby named the proper party Defendant in this case. The Court now turns to Defendant's Motion for Summary Judgment.

## MOTION FOR SUMMARY JUDGMENT

Defendant argues it is entitled to summary judgment because (1) Plaintiff is judicially estopped from asserting her claims due to her failure to disclose this lawsuit in her Chapter 13 petition for bankruptcy, and (2) no evidence exists creating a genuine issue of material fact as to the merits of each of her claims. The Court addresses each argument in turn below.

### LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."[5]  Not all factual disputes render summary judgment inappropriate; only a genuine issue of

---

[4] Fed. R. Civ. P. 15(a)(2).
[5] Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

material fact will defeat a properly supported motion for summary judgment.[6]  This means summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[7]

On summary judgment, the Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party; the Court may not make credibility determinations or weigh the evidence.[8]  The moving party "always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[9]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to respond by setting forth specific evidence in the record and articulating the precise manner in which that evidence creates a genuine issue of material fact or that the moving party is not entitled to a judgment as a matter of law.[10]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[11]

---

[6] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

[7] See id. at 249-52.

[8] See id. at 254-55; Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

[9] Celotex, 477 U.S. at 323 (internal quotation marks omitted).

[10] See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at 324-26.

[11] Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

**JUDICIAL ESTOPPEL**

Defendant argues Plaintiff is judicially estopped from bringing any claims for money damages because she failed to disclose this lawsuit to bankruptcy creditors and the Bankruptcy Court when she filed her voluntary petition for bankruptcy under Chapter 13.

Plaintiff filed this lawsuit on May 1, 2015. Five months later, on October 13, 2015, Plaintiff filed a Chapter 13 voluntary petition for bankruptcy in the United States Bankruptcy Court for Middle District of Georgia. On her Statement of Financial Affairs, Plaintiff was required to "[l]ist all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case."[12] Plaintiff marked "None" on the Petition, despite having filed this lawsuit five months earlier. On January 5, 2016, Defendant filed this Motion for Summary Judgment raising the issue of judicial estoppel. A little over a month later, on February 10, 2016, Plaintiff filed an Amended Statement of Financial Affairs identifying this lawsuit. On April 1, 2016, the Bankruptcy Court entered its Order modifying the Plan to include any money received as part of any lawsuit.

"Judicial estoppel is an equitable doctrine invoked at the Court's discretion."[13] This doctrine "prevents a party from asserting a claim in a legal proceeding that is

---

[12] *In re Shamika Corbin*, BR Case No. 15-52380, M.D. Ga. [Doc. 1, p. 26]

[13] *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (citing *new Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

inconsistent with a claim taken by that party in a previous proceeding."[14] The doctrine is "intended to prevent the perversion of the judicial process."[15] In determining whether judicial estoppel applies, courts consider two factors: first, the party against whom judicial estoppel is sought must have asserted a claim in a legal proceeding that is inconsistent with a position made under oath in a prior proceeding; second, "such inconsistencies must be shown to have been calculated to make a mockery of the judicial system."[16] The facts "are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine."[17]

Here, the first element for application of judicial estoppel is satisfied because Plaintiff failed to disclose this lawsuit in her Bankruptcy Petition despite her electronic signature on the Petition declaring under penalty of perjury the information in the petition was true and accurate. [18] Thus, the determinative issue is whether Plaintiff had the requisite intent for judicial estoppel to apply.

"For purposes of judicial estoppel, intent is a purposeful contradiction—not

---

[14] *Id.* at 751.

[15] *Id.* at 1285 (internal quotation marks and citation omitted).

[16] *Id.* (internal quotation marks and citation omitted).

[17] *Id.* at 1286.

[18] *See, e.g., Robinson v. Tyson Foods, Inc.,* 595 F.3d 1269, 1275 (11th Cir. 2010) (failure to amend Chapter 13 bankruptcy filings to reflect a pending claim while simultaneously pursuing that claim in another court constitutes inconsistent positions under oath).

simple error or inadvertence."[19] "When considering a party's motive and intent and whether it justifies applying judicial estoppel, [the Eleventh Circuit] require[s] that the intent be cold manipulation and not an unthinking or confused blunder."[20] In cases where a debtor fails to disclose a claim or potential claim in a bankruptcy proceeding, the court will find the failure inadvertent only when the debtor either (i) lacks knowledge of the undisclosed claim or (ii) has no motive for its concealment.[21] Otherwise, intent may be inferred.[22] "When reviewing potential motive, the relevant inquiry is intent at the time of nondisclosure."[23] "[A] financial motive to secret assets exists under Chapter 13 as well as under Chapter 7 because the hiding of assets affects the amount to be discounted and repaid."[24]

The Court finds a hearing is necessary to determine whether Plaintiff held the requisite intent for a finding she is judicially estopped from asserting her claims for money damages. The hearing will be held on October 18, 2016 in Macon, Georgia.

## CASE ON THE MERITS

Even if this Court finds Plaintiff is judicially estopped from asserting her claims for money damages, such estoppel will not affect her claims for declaratory and

---

[19] *Barger v. City of Cartersville, Ga.*, 348 F.3d 1289, 1293 (11th Cir. 2003) (internal quotation marks and citation omitted).

[20] *Ajaka v. BrooksAmerica Mortg. Corp.*, 453 F.3d 1339, 1345 (11th Cir. 2006) (internal quotation marks and citation omitted).

[21] *Burnes*, 291 F.3d at 1287.

[22] *Id.*

[23] *Robinson*, 595 F.3d at 1276.

[24] *DeLeon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003).

injunctive relief.[25] Thus, the Court now turns to Plaintiff's claims on the merits.

## BACKGROUND

Defendant employed Plaintiff as a laboratory phlebotomist for over ten years, until Defendant terminated her on January 19, 2015, for repeated violations of Defendant's attendance policy. Plaintiff, however, contends Defendant fired her for absences and tardiness due to her daughter's serious health condition, in violation of the ADA and FMLA. For purposes of this Motion, the material facts in the light most favorable to Plaintiff, the non-movant, are as follows:

Defendant's Attendance Policy

Defendant has implemented a detailed Attendance Policy which it gives to all employees, including Plaintiff when she began her employment. The Attendance Policy outlines the importance of both good attendance by the employee and "fair and equitable resolutions" by the employer when attendance problems occur:

> Good attendance is basic to the employment relationship and will be encouraged. Also, when problems occur, such as tardiness, unscheduled absence, failure to call in, and leaving early, appropriate response must be taken to bring forth fair and equitable resolutions. Therefore, the policy emphasizes the importance of being at work on time and when scheduled.[26]

Although Defendant deemed poor attendance habits, such as unscheduled absences and

---

[25] *See Burnes*, 291 F.3d at 1289 (doctrine of judicial estoppel applies only to claims for monetary damages and does not bar claims for injunctive and declaratory relief).

[26] MCNH Employee Handbook, p. 28 [Doc. 13-5, p. 144].

tardiness, unacceptable and intolerable,[27] managers had the "discretion to exclude certain occurrences that are beyond the employee's control."[28] Moreover, department heads provided specific guidelines to employees regarding how to give notice and whom to call for tardies and absences.

Defendant used a point-accrual system for tardies and unexcused absences, assessing .25 points for each tardy and .50 points for each absence. For violations of the Attendance Policy, Defendant disciplined employees using the following progressive discipline system:

| Tardies | Unscheduled Absences or Tardies + Absences | Disciplinary Action |
|---------|--------------------------------------------|---------------------|
| 1.0 points | 6 points | Verbal counseling |
| 2 points | 8 points | Verbal warning (documented) |
| 2.5 points | 10 points | Written warning + 3 months probation |
| 3 points | 12 points | Termination |

An employee accumulated points based on a 12-month rolling period, beginning with the first violation. Violations older than the 12-month period would roll off and thus would no longer be counted for disciplinary purposes.

However, the Attendance Policy was not rigid, and managers had discretion over how to assess points. The Policy authorized termination when an employee accumulated 12.0 points for unexcused absences and tardies, when an employee was on probation for excessive absence and/or tardiness and received additional occurrences and points, and

---

[27] MCNH Attendance Policy, p. 6 [Doc. 13-7, p. 13]
[28] *Id.* at p. 1 [Doc. 13-7, p. 8].

when an employee abused the Time and Attendance policy by receiving "multiple written documentations for the same issues."[29]

<u>FMLA Leave Procedure</u>

Defendant used an outside company, The Hartford, to manage its employees' FMLA leave. Under Defendant's FMLA Policy, employees are required to contact The Hartford to report a FMLA claim and notify their manager regarding the estimated length of leave. For intermittent FMLA leave, employees are required to contact their manager and The Hartford "every time [they] are absent from work relating to FMLA."[30]

<u>Reporting Leave in Plaintiff's Department</u>

Plaintiff worked the night shift as a phlebotomist in Defendant's laboratory. At all times relevant to this action, Plaintiff's immediate supervisor was Preston Barber. Barber created and posted a monthly work schedule for the night phlebotomist staff. Plaintiff's assigned work shift was generally from 2:00 a.m. to 10:30 a.m.

As a non-exempt employee, Plaintiff was required to record her time by clocking in and out each day in Defendant's computerized time-entry system using her employee badge. These time records were Plaintiff's official attendance record. Although the Attendance Policy provided employees could be counted as tardy when one minute late, Barber, pursuant to his discretion, considered the lab employees tardy only when the

---

[29] *Id.* at p. 3 [Doc. 13-7, p. 10].
[30] FMLA Policy, Ex. 5 to Pl's Depo. [Doc. 13-6, p. 102].

employee clocked in five minutes late or more after a shift was scheduled to start.

Every other week, as part of his supervisory responsibilities, Barber reviewed the time records, marked tardies, and made notations in his department supervisor report. The department supervisor report showed each employee's attendance and tardy records for the last 12 months. Barber tracked each employee's attendance for evaluation and disciplinary purposes.  If an employee called in to say he or she would not make the scheduled shift, Barber would reflect it on the monthly schedule and would sometimes include additional information, such as the reason why an employee was late or absent. All employees had access to view the attendance report and could report any misinformation to the employee's supervisor or another manager.

Plaintiff was aware of Defendant's Attendance and FMLA Policies, including the tardy and absence point-accrual system and the requirement to contact The Hartford regarding all FMLA leave.

<u>Plaintiff's Written Warnings for Attendance Violations & FMLA Leave Approval</u>

At the end of 2013, Plaintiff's daughter began "aggressively getting sick,"[31] and as a result, Plaintiff was often absent or tardy to work. Indeed, in December 2013, Plaintiff received a verbal warning because she had accumulated 8.0 attendance points due to absences and tardies.

During the spring or early summer of 2014—it is unclear from the record exactly

---

[31] Pl. Depo., p. 88 [Doc. 13-4, p. 28].

when—Plaintiff's daughter became "really ill"[32] and was diagnosed with severe gastrointestinal disorders. As a result of taking care of her daughter, Plaintiff was often tardy or absent from work and accumulated more points for her absences and tardies. Plaintiff informed Barber every time she was going to be late or absent due to her care for her daughter, and Barber would "always say, Shemika—take care of your daughter. I'll see you when you get to work."[33] However, despite these niceties, Plaintiff contends she and Barber had problems "ever since [her] daughter got sick."[34]

On June 23, 2014, Defendant issued Plaintiff a written warning and three months' probation because she had accumulated more than 10.0 attendance points in a rolling 12-month period due to tardies and absences. Plaintiff signed the written warning which warned her any further violations could result in her termination. Although Plaintiff claims most of the points were due to the care of her daughter, Plaintiff had neither been approved nor had she requested any FMLA leave.

From October 20 through 27, 2014, Plaintiff's daughter was hospitalized due to her illnesses. On October 23, 2014, Plaintiff applied to The Hartford for FMLA-approved leave. The Hartford approved her requests, and Plaintiff received continuous FMLA leave for her absences due to her daughter's hospitalization from October 20-27. Additionally, The Hartford approved intermittent FMLA leave for Plaintiff's future

---

[32] *Id.* at p. 112 [Doc. 13-4, p. 52].

[33] *Id.*

[34] Pl. Depo., p. 109 [Doc. 13-4, p. 49].

absences and tardiness due to her daughter's health conditions through April 19, 2015. The FMLA approval letter reminded Plaintiff "it is your obligation to contact The Hartford either at the telephone number listed below or at www.thehartford.com to report each date and time you are absent from work related to your intermittent leave" and to give notice to her employer "the same or following business day of when the need for leave becomes known to the employee."[35] The letter also warned Plaintiff "that failure to provide the requested information to The Hartford may prevent [them] from making a determination regarding your request for leave. As a result, you may lose protections afforded to you under any leave plans noted in the table above."[36]

On October 27, 2014, four days after The Hartford approved her FMLA requests, Defendant issued Plaintiff a second written warning and three months' probation for violation of the Attendance Policy because she had accumulated additional absences and tardies for a total of 11.0 attendance points. It does not appear the additional points Plaintiff accumulated since June were due to her daughter's hospitalization or illnesses. Plaintiff signed this second warning, acknowledging further violations could result in her termination. Plaintiff also informed Barber she had requested FMLA leave for tardies and absences due to her daughter's health conditions.  Thereafter, when Plaintiff reported an absence or tardy due to her daughter's health conditions, Barber states he always

---

[35] Letter from The Hartford dated 10/23/2014, Ex. 43 to Pl. Depo. [Doc. 13-6, p. 79].
[36] *Id.*

considered the absence or tardy to be excused and did not assess any attendance points, regardless of whether Plaintiff received approved FMLA leave.

Plaintiff's Termination

It appears Barber started to become frustrated with Plaintiff's absences and tardies. On November 18, 2014, Plaintiff left work early due to a doctor's appointment for her daughter. When noting Plaintiff's absence on his report, Barber wrote, "Worked 10-630. Appt for daughter. (Last minute of course)."[37] Plaintiff did not seek FMLA leave for this absence, but Barber exercised his discretion, excused her absence, and did not assess her any attendance points.

In December, Plaintiff requested to be off on New Year's Eve and New Year's Day. Barber, however, denied Plaintiff's request because she had been off the previous year, and Barber tried to alternate which employees would be off for the holidays. At 5:31 pm on Tuesday, December 30th, Plaintiff texted Barber her daughter was ill, Plaintiff was taking her to the doctor, and thus, she would be unable to work on December 31st.[38] Barber responded to Plaintiff: "Take care of your family."[39] However, less than four hours later, at 10:07 pm, Barber emailed Beatrice Ross, Defendant's Employee Relations Specialist, inquiring about proper grounds for terminating an employee due to attendance violations. Specifically, Barber wrote:

---

[37] November monthly report, Doc. 13-6, p. 7.
[38] Text Messages between Plaintiff and Barber [Doc. 20-3, p. 2].
[39] *Id.*

14

> Good morning Bea! I have a question concerning T&A [tardies and absences] probation. During the 3 months employee is on probation for T&A, if there are any attendance occurrences, could that be grounds for termination?[40]

In noting Plaintiff's December 31st absence on his monthly report, Barber wrote: "Called in: daughter sick. Yeah right. Scammed again."[41]

Plaintiff also did not work on Thursday, January 1st due to her daughter's illness. Plaintiff did work her scheduled shift on Friday, January 2nd. Plaintiff had taken her daughter to her grandmother, so Plaintiff could work her scheduled 2:00 a.m. – 10:30 a.m. night shift. At 1:34 a.m., just prior to starting her shift, Plaintiff texted Barber she would not be able to work the next day, Saturday, January 3rd, because her daughter was sick, and her family would not be back in town to stay with her daughter while Plaintiff worked. Barber responded:

> Barber:     its funny that u can work tonight, but daughter will be sick tomorrow night. Do whatever u want. Enjoy ur weekend.
> I will need a dr. Excuse for Saturday since you are refusing to work on-call. If you do not provide one, I will probably have to do a write-up.

> Plaintiff:     I understand she still sick, I can't be written up because it's about [my daughter], I need to talk to human resource because I didn't do nothing wrong.
> I'm here [at work] because I took her to Roberta to her grandma house that's the only reason why I'm being picked on for what reason.

> Barber:     I just worked 2 13 hour days to cover for call-ins. Please forgive

---

[40] Email from Barber to Ross, Dec. 30, 2014, 10:07 pm [Doc. 13-9, p. 10].
[41] Doc. 13-6, p. 11.

> me if I don't think this is the time or place for this conversation.
> Today is my ONE day off this week. Thank you.
> If you have some spare time, read the attendance policy
> concerning fmla[.][42]

Plaintiff did not work on Saturday, January 3rd or Sunday, January 4th due to her daughter's illnesses. The Hartford approved all of Plaintiff's absences on December 31, and January 1, 3, and 4 under FMLA, and she was not assessed any points for attendance violations.

At some point during this time, Barber reviewed Plaintiff's attendance records and determined Plaintiff had accumulated three unexcused tardies: On November 20, 2014, Plaintiff clocked in at 2:10 am, ten minutes late; on December 3, 2014, Plaintiff again clocked in ten minutes late at 2:10 am; and on December 23, 2014, Plaintiff clocked in eighteen minutes late at 2:18 am.

On Monday, January 5th, Beatrice Ross responded to Barber's email confirming a probationary employee who accrues further attendance violations could be terminated, and she asked for specific details. Barber responded to Ross's email:

> One of my employees, [Plaintiff], has been on probation for T&A for the past 5 months. She last received a written warning/probation on 10/27/14. Since then, she has had 3 tardies. Her T&A problem has been persistent over the past year or more. What is your opinion on how this should be handled?[43]

On January 7th, Ross responded:

---

[42] Text messages between Plaintiff and Barber [Doc. 20-3, pp. 4-5].
[43] Email from Barber to Ross dated January 5, 2015 [Doc. 13-9 p. 9].

Hello Preston,

I was unable to get into Sovera [the electronic system Defendant used to store employee records] earlier today to determine what was in [Plaintiff's] files. However, it appears that she has been on Written Warning twice within a 12 month period. In fact, she is currently on probation and subsequently has been tardy three additional times. Needless to say, she has displayed a pattern of abusiveness.

I would first speak to her about this. In essence, ask her if there is anything beyond her control that is prohibiting her from arriving to work when scheduled. If she has no justifiable response, you may want to discuss with Regina [Nowell, the lab manager] about a warranted termination based on policy.[44]

Regina Nowell also instructed Barber to ask Plaintiff if she had any excuse for her tardies.

On January 8, 2015, Barber met with his entire department "to discuss early clocking out because it had become such a problem."[45] Plaintiff attended that meeting.

On January 11, 2015, Barber responded to Ross's email:

Bea,

I spoke with [Plaintiff] this morning. She does not recall a reason for being tardy on 11/20/14, 12/3/14, or 12/23, 2014.[46]

Plaintiff, however, denies Barber ever asked her about these tardies.

Defendant's termination procedures require a supervisor receive consensus from upper-level managers and Human Resources before proceeding with terminating an employee. The employee's immediate supervisor usually initiates the termination, but managers and Human Resources must approve the termination is proper. After Barber

---

[44] Email from Ross to Barber dated Jan. 7, 2015 [Doc. 13-9 p. 9].
[45] Barber Declaration, ¶ 18 [Doc. 13-8, p. 5].
[46] Email from Barber to Ross dated Jan. 11, 2015 [Doc. 13-9, p. 9].

initiated Plaintiff's termination, and Beatrice Ross confirmed termination was justifiable under the Attendance Policy, Plaintiff's termination was approved by the manager and director of the lab – Rick Bogden and Regina Nowell – and approved by the manager and director of Human Resources – Ron Sands and Clinton Jones.   On January 16, 2015, Beatrice Ross emailed the manager of Human Resources, Clinton Jones:

> Clint,
>
> Regina Nowell has a Phlebotomist, Shemika Corbin, who has been employed since 2/2/2004 and Regina wants to terminate her due to T&A [tardies and absences]. She has been progressively disciplined and was placed on 3 months' probation on 6/24/2014, as well as, 10/27/2014. Since she has been on the current probation she has had 6 additional occurrences, including clocking out early without permission.
>
> Certainly, this warrants termination and according to Regina, Tom Sands is in agreement with the termination.
>
> Please advise.
>
> Thanks,
>
> Bea.[47]

Twenty-four minutes later, Jones emailed: "Fine with me to proceed with discharge."[48]

On January 19, 2015, Defendant terminated Plaintiff from employment for violations of the Attendance Policy, namely, because she had accrued three unexcused tardies on November 20, December 3, and December 23 while on her second

---

[47] Email from Ross to Jones dated Jan. 16, 2105 [Doc. 13-7, p. 17].
[48] Email from Jones to Ross [Doc. 13-7, p. 17].

probationary status for attendance violations.  Defendant had no record Plaintiff was tardy on those three days because of her daughter's health condition; The Hartford had no record of a request for FLMA leave for those three days; and Plaintiff cannot recall why she was tardy on those dates.

## DISCUSSION

Plaintiff brings three claims against Defendant: (1) an ADA associational disability discrimination claim contending Defendant terminated her due to her daughter's disabilities; (2) a FMLA interference claim contending Defendant interfered with her protected time off under the FMLA; and (3) a FMLA retaliation claim contending Defendant terminated her in retaliation for exercising her right to time off under the FMLA. Defendant moves for summary judgment on each claim.

## I.   ASSOCIATIONAL DISABILITY DISCRIMINATION

Plaintiff contends Defendant discharged her because of her association with her disabled daughter. Plaintiff brings this claim under the "association discrimination" provision of the ADA, which makes it unlawful for an employer to "exclud[e] or otherwise deny[] equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."[49]

Because the record contains no direct evidence Defendant terminated Plaintiff

_____

[49] 42 U.S.C. § 12112(b)(4).

because of her daughter's health condition, the Court must analyze this claim using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[50] Under this framework, a plaintiff must first establish a prima facie case by establishing "facts adequate to permit an inference of discrimination."[51] To establish a prima facie case of associational discrimination, a plaintiff must present evidence that (1) she suffered an adverse employment action; (2) she was qualified for the job; (3) her employer knew that she had a relative with a disability; and (4) "the adverse employment action occurred under circumstances which raised a reasonable inference that the disability of the relative was a determining factor in [the employer's] decision."[52]

If the plaintiff establishes her prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[53] If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who must show that the employer's proffered reasons were merely pretext for discrimination.[54] Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[55]

The Court notes the *McDonnell Douglas* method "was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the

---

[50] 411 U.S. 792 (1973); s*ee Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)

[51] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[52] *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).

[53] *Cleveland*, 369 F.3d at 1193.

[54] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[55] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

evidence in light of common experience as it bears on the critical question of discrimination."[56] Ultimately, a plaintiff will overcome summary judgment if she creates a genuine issue of material fact that permits a "reasonable inference" the employer acted with discriminatory intent.[57]

Defendant argues Plaintiff cannot establish a prima facie case because she was not qualified for the job. The Court agrees. "Qualified" means "she, with or without reasonable accommodation, can perform the essential functions and job requirements of the position [she] holds."[58] Although the ADA requires employers to provide disabled employees with reasonable accommodations, the ADA does not require an employer to provide reasonable accommodations to an employee that associates with a disabled relative. Thus, an employee is not "qualified" if she fails to meet the attendance requirements of her job—even when the employee is absent to care for a disabled child, and when the employer grants the employee's requests for leave.[59] "[A]n employer does not violate[] the ADA by discharging an employee who was frequently absent from work due to her disability and that of a family member."[60]

Viewing the facts in the light most favorable to Plaintiff, the Court must find she was unqualified for her job for purposes of her ADA claim because she failed to meet her

---

[56] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).

[57] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

[58] *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam).

[59] *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1231 (11th Cir. 1999).

[60] *Id.*

job's attendance requirements, regardless of whether such absences and tardies were due to the care of her daughter. The Court is unpersuaded by Plaintiff's argument that a genuine issue of material fact exists as to whether she had sufficient attendance violations to warrant her termination. Defendant's Attendance Policy clearly stated "if an employee is on probation for excessive absence and/or tardiness, additional occurrences and points, as indicated in the guidelines, will be justification for termination of employment."[61] It is undisputed Plaintiff understood she was required to work in accordance with this policy, and Plaintiff violated the policy by accruing three tardies while she was on her second probation for attendance violations within a 12-month period. "If a non-disabled employee violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the disabled associate."[62] Thus, Plaintiff cannot establish a prima facie case of associational disability discrimination, and Defendant is entitled to summary judgment. On this claim.

## II.    FMLA CLAIMS

The Family Medical Leave Act of 1993 requires an employer to allow an eligible employee to take up to 12 weeks of leave during every 12-month period to care for a minor child with a serious health condition.[63] An employee can take this leave on a continuous basis or on an intermittent basis, meaning "in separate blocks of time due to a

---

[61] Attendance Policy, p. 3 [Doc. 13-7, p. 10].
[62] *Den Hartog v. Wasaton Acad.*, 129 F.3d 1076, 1083 (10th Cir. 1997).
[63] 29 U.S.C. § 2612(a)(1)(C).

single qualifying reason."[64]

"Under section 2615(a) of the FMLA, an employee may bring two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and retaliation claims, in which an employee asserts that his employer discriminated against him because he is engaged in an activity protected by the Act."[65] The primary difference between an interference and retaliation claim is the employer's intent. In an interference claim, the employee merely has to prove that she was entitled to a benefit and that the employer interfered with that benefit. "[T]he employer's motives are irrelevant."[66] In contrast, to succeed on a retaliation claim, an employee . . . faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory . . . animus.'"[67] Plaintiff brings claims for both interference and retaliation.

### a.  FMLA RETALIATION CLAIM

Plaintiff contends Defendant terminated her employment in retaliation for taking FMLA leave to care for her daughter. To succeed on a FMLA retaliation claim, an employee must demonstrate her employer intentionally discriminated against her in the form of an adverse employment action for having exercised a FMLA right.[68] "In other

---

[64] 29 C.F.R. § 825.202.

[65] *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2015).

[66] *Strickland v. Water works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001).

[67] *Id.* at 1207 (quoting *King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)).

[68] *See Strickland*, 239 F.3d at 1207.

words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'"[69]

Despite Plaintiff's contentions otherwise, the record contains no direct evidence of discrimination. Thus, the Court must analyze this claim under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas*.[70] To state a claim for retaliation, an employee must show (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity.[71] If the employee makes this showing, "the burden then shifts to the defendant to articulate a legitimate reason for the adverse action."[72] "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual."[73]

Defendant concedes Plaintiff meets the first two elements of her prima facie case, but argues Plaintiff cannot establish causation. Defendant invites this Court to require Plaintiff prove causation using the heightened "but-for" standard instead of the traditional "motivating factor" causation standard currently applicable to FMLA retaliation cases in the Eleventh Circuit. The Court, however, declines Defendant's

---

[69] *Id.*

[70] *Id.*

[71] *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

[72] *Id.*

[73] *Id.*

invitation. In raising this argument, Defendant simply states the "but-for" causation standard should apply to FMLA claims and footnotes the Supreme Court's recent decision in *University of Texas Southwestern Medical Center v. Nassar*.[74]  Defendant makes no other arguments regarding this issue. There is no binding Supreme Court or Eleventh Circuit precedent on this issue. Indeed, the Eleventh Circuit in its most recent case on FMLA retaliation, albeit an unpublished one, has stated "in the FMLA context, neither the Supreme Court nor [the Eleventh Circuit] has required plaintiffs to prove that illegal retaliation was the 'but-for' cause of the adverse employment actions suffered."[75] The current state of the law in this Circuit only requires Plaintiff to prove her use of FMLA leave was a motivating factor in her termination, and Defendant has made no arguments convincing this Court otherwise. Thus, this Court will analyze Plaintiff's prima facie case using the lower motivating factor standard.

To establish a prima facie case of FMLA retaliation, Plaintiff must show her use of FMLA leave and her termination were not "wholly unrelated."[76] A plaintiff can meet this burden by showing "the decision maker was aware of the protected conduct at the time of the adverse employment action."[77] "Close temporal proximity between protected conduct and an adverse employment is generally 'sufficient circumstantial evidence to

---

[74] 570 U.S. ---, 133 S. Ct. 2517 (2013) (requiring "but-for" causation in Title VII retaliation cases)..

[75] *Coleman v. Redmond Park Hosp., LLC*, 589 F. App'x 436, 438 (11th Cir. 2014).

[76] *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234 (11th Cir. 2010).

[77] *Id.*

create a genuine issue of material fact of a causal connection.'"[78] There is no dispute Defendant knew Plaintiff had been approved for intermittent FMLA leave until April 2015. Because Defendant terminated Plaintiff less than three week after she invoked her right to use her pre-approved intermittent FMLA leave on December 30th, a genuine dispute exists regarding whether her invocation of her FMLA rights was the cause of her termination. Thus, Plaintiff has established a prima facie claim for FMLA retaliation.

Defendant, however, has presented evidence Plaintiff was legitimately terminated for violations of its Attendance Policy. Thus, the Court must determine whether Plaintiff has submitted sufficient evidence to withstand summary judgment on the issue of pretext.

To establish pretext, a "plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. . . . [The plaintiff] may succeed in this <u>either</u> directly by persuading the court that a discriminatory reason more likely motivated the employer <u>or</u> indirectly by showing that the employer's proffered explanation is unworthy of credence."[79] To do so, "a plaintiff may point to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reason."[80] "However, a plaintiff cannot merely quarrel with the wisdom of the

---

[78] *Hurlbert*, 439 F.3d at 1298 (quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

[79] *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (emphasis added) (quotations and citation omitted).

[80] *Diaz v. Transatlantic Bank*, 367 F. App'x 93, 97 (22th Cir. 2010) (quoting *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)).

employer's reason, but must meet the reason head on and rebut it."[81] While close temporal proximity between the protected activity and an adverse employment action is evidence of pretext, it is "probably insufficient to establish pretext by itself."[82]

From this record, a jury could determine Defendant legitimately terminated Plaintiff based on her violations of the Attendance Policy. Plaintiff had a history of unexcused tardies and absences throughout her employment with Defendant, including the three unexcused and unexplained tardies on November 23, December 3, and December 23 while she was on her second probationary status for attendance violations in the past 12 months. However, the record also contains sufficient evidence from which a jury could reasonably conclude Plaintiff's FMLA leave more likely motivated Defendant to terminate her than the three unexcused tardies she accumulated, and those tardies were merely pretext for retaliation.

First, a jury could reasonably find Barber harbored discriminatory animus toward Plaintiff for using FMLA leave. Plaintiff testified she and Barber began having "problems" when her daughter got sick,[83] and Barber made "dubious comments" about her need to take off work to care for her daughter in front of her coworkers.[84] In noting Plaintiff's absence on November 18th, an excused absence under FMLA, Barber wrote:

---

[81] *Id.* (internal quotation marks and citation omitted).

[82] *Hurlburt*, 439 F.3d at 1298.

[83] Pl. Depo., p. 109 [Doc. 13-4, p. 49].

[84] Pl. Decl., p. 2 [Doc. 20-4].

"Appt. for daughter (Last minute of course)."[85] Even more telling is his note on December

31, 2014, another approved FMLA absence, in which he wrote: "Called in: daughter sick.

Yeah right. Scammed again."[86] Moreover, a jury could find Barber's text messages to

Plaintiff over the New Year's holiday show not only his doubt over her FMLA excuse,

but also his frustration, anger, and even hostility:

> Barber:        its funny that u can work tonight, but daughter will be sick
>                tomorrow night. Do whatever u want. Enjoy ur weekend.
>                I will need a dr. Excuse for Saturday since you are refusing to
>                work on-call. If you do not provide one, I will probably have to
>                do a write-up.
>
> Plaintiff:     I understand she still sick, I can't be written up because it's
>                about [my daughter], I need to talk to human resource because
>                I didn't do nothing wrong.
>                I'm here [at work] because I took her to Roberta to her grandma
>                house that's the only reason why I'm being picked on for what
>                reason.
>
> Barber:        I just worked 2 13 hour days to cover for call-ins. Please forgive
>                me if I don't think this is the time or place for this conversation.
>                Today is my ONE day off this week. Thank you.If you have
>                some spare time, read the attendance policy concerning
>                fmla[.][87]

Second, the close temporal proximity between Plaintiff's use of FMLA leave and

her termination supports a finding of pretext. Plaintiff was terminated less than three

weeks after she used her approved FMLA leave on December 31, January 1, 3 and 4 due

---

[85] November monthly report [Doc. 13-6, p. 7].
[86] December monthly report [Doc. 13-6, p. 11].
[87] Text messages between Plaintiff and Barber [Doc. 20-3, pp. 4-5].

to her daughter's illness. Indeed, Barber emailed Beatrice Ross and initiated Plaintiff's termination proceedings a mere <u>five hours</u> after Plaintiff texted Barber on December 30th she could not work the next day because of her daughter's illness.

Third, although Barber could have initiated termination proceedings earlier, the fact he initiated such proceedings only after Plaintiff invoked her FMLA leave on December 30 supports a finding of pretext. Barber had discretion over which of Plaintiff's tardies he counted as violations of the Attendance Policy. Barber avers he counted tardies over seven minutes late as violations of the Attendance Policy. However, the time and attendance records reflect Plaintiff had at least one other tardy, on November 11, 2014, in which she clocked in at 2:12 a.m., twelve minutes past the scheduled shift time, yet Barber did not assess Plaintiff any points for this tardy even though no records reflect this tardy was due to her child's illness or that she received approved FMLA leave. Thus, by December 4, 2014, Plaintiff had accumulated three unexcused tardies on November 11, November 23, and December 3 while on her second probation for attendance violations in twelve months. Barber, however, did not initiate termination proceedings at that time; instead, he initiated them only after Plaintiff took FMLA leave on December 30, using her tardy on December 31st as justification for the termination.

Fourth, although Plaintiff's termination was approved by two upper-level managers and two human resources employees, a jury could reasonably conclude these managers and HR personnel merely "rubber stamped" Barber's recommendation for

termination based on his discriminatory animus. The record contains no evidence Barber's managers or the HR representatives independently evaluated Plaintiff's records or spoke with her prior to approving her termination. Indeed, Beatrice Ross tells Barber she "was unable to get into Sovera [the electronic system Defendant used to store employees' records] earlier today to determine what was in [Plaintiff's] HR files."[88] And Clinton Jones approved Plaintiff's termination a mere 24 minutes after receiving an email from Ross.[89]

Moreover, a fact issue exists as to whether Barber actually determined Plaintiff's tardies were unexcused. Both Beatrice Ross and Barber's manager, Regina Nowell, instructed Barber to speak with Plaintiff to determine if Plaintiff has a "justifiable response" for the tardies.[90] Although Barber contends he spoke with Plaintiff about these tardies, Plaintiff denies any such conversation took place. If a jury believes Barber never spoke to Plaintiff regarding the reason for the tardies, then the approval for termination would be based in part on Barber's lie that the tardies were unexcused.

Finally, a jury could find Defendant's approval for termination was based on faulty reasoning because Barber did not consistently apply the Attendance Policy. Defendant legitimizes Plaintiff's termination based on her violations of the Attendance Policy with her three unexcused tardies on November 20, December 3, and December 31.

---

[88] Email from Ross to Barber dated 1/7/14 [Doc. 13-9, p. 9].

[89] Email from Ross to Jones dated 1/16/2015 at 5:00; Email from Jones to Ross dated 1/16/2015 at 5:24pm [Doc. 13-7, p. 17].

[90] *Id.*

The evidence reflects, however, Plaintiff's termination was approved because of <u>six</u> "occurrences," including clocking out early without permission. In obtaining approval for Plaintiff's termination from Human Resources Manager Clinton Jones, Beatrice Ross wrote, "[Plaintiff] has been progressively disciplined and was placed on 3 months probation on 6/24/2014, as well as 10/27/2014. Since she has been on the current probation she has had 6 additional occurrences, including clocking out early without permission."[91] First, no evidence exists regarding the nature of these "six occurrences." Moreover, Barber admits his entire department had a problem clocking out early. Indeed, Barber met with his department on January 8, 2015, "to discuss early clocking out because it had become such a problem."[92] By January 8, 2015, Plaintiff's termination proceedings were well under way, and she was terminated eleven days later.

Based on this evidence, a jury could find Barber had discriminatory animus toward Plaintiff based on her FMLA leave, he did not consistently apply the Attendance Policy in his department, and the upper level managers and representatives from Human Resources merely rubber stamped Barber's recommendation for termination. Thus, summary judgment must be denied on this claim.

**b.** **FMLA INTERFERENCE CLAIM**

Plaintiff also asserts a FMLA interference claim against Defendant. The FMLA

---

[91] Email from Ross to Jones dated 1/16/2015 [Doc. 13-7, p. 17].
[92] Barber Declaration, ¶ 18 [Doc. 13-8, p. 5].

prohibits an "employer [from] interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under this subchapter."[93] To state a FMLA interference claim, an employee need only "demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled."[94] "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."[95]

Defendant contends Plaintiff cannot show Defendant denied her a benefit to which she was entitled because Plaintiff was never denied the opportunity to use her FMLA leave; on the contrary, Plaintiff requested and received FMLA leave without incident. However, Plaintiff does not claim Defendant refused to authorize her FMLA claims. Instead, Plaintiff claims Defendant interfered with her FMLA rights because it terminated her while under the protections of approved intermittent FMLA leave. To state a FMLA interference claim based on termination, the employee's "request for leave must have been the proximate cause of the termination."[96] Moreover, the employee must demonstrate the denial of the benefit harmed her.[97]

For the reasons stated above, a genuine issue of material fact exists as to whether

---

[93] 29 U.S.C. §2615(a)(1).

[94] *Pereda*, 666 F.3d at 1274 (internal quotation marks omitted).

[95] 29 C.F.R. § 825.220(b).

[96] *Rudy v. Walter Coke, Inc.*, 613 F. App'x 828, 830 (11th Cir. 2015).

[97] *See Demers v. Adams Homes of Northwest Florida, Inc.*, 321 F. App'x 847, 849 (11th Cir. 2009) (employer entitled to summary judgment on interference claim where employee "cannot articulate any harm suffered from [the] denial" of FMLA leave") (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)).

Plaintiff's FMLA leave was the proximate cause of her termination. Thus, a jury must determine whether Defendant interfered with Plaintiff's FMLA rights.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Amend Complaint [Doc. 19] is **GRANTED**. Defendant's Motion for Summary Judgment [Doc. 34] is **GRANTED in part and DENIED in part**. The Motion is GRANTED as to Plaintiff's ADA claims and DENIED as to Plaintiff's FMLA claims. The parties are **DIRECTED** to appear before this Court on October 18, 2016 at 2:00 p.m. for a hearing to determine whether Plaintiff's failure to disclose this case in her Bankruptcy Petition judicially estops her from asserting her claims for money damages.

**SO ORDERED**, this 29th day of September, 2016.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT